ESTATE OF ANGELA NICOLE
LAWSON, BY DEBORAH FINK,
ADMINISTRATRIX,

               Plaintiff,

     v.                                Case No. C-1-07-927

CITY OF HAMILTON,
OHIO, et al.,

               Defendants.


## ORDER

    This matter is before the Court on cross-motions for summary judgment filed by defendants City of Hamilton, Ohio, Richard P. Burkhardt, Richard Heidorn, Jeffrey W. Sandlin and Carole A. Walters (doc. 30) and by plaintiff Estate of Angela Nicole Lawson, By Deborah Fink, Administratrix (doc. 40). The parties have filed proposed findings of fact and conclusions of law, which the opposing side has highlighted as true, false or irrelevant (docs. 42, 43). The Court heard oral arguments on the parties' motions on May 12, 2009.

### I. Introduction

    Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 and provisions of the laws and Constitution of the State of Ohio. Plaintiff seeks damages to redress alleged violations of the rights of the decedent, Angela Lawson, under the Fourth and Fourteenth Amendments to the United States Constitution; Sections 1, 9, 10 and 14 of the Ohio Constitution; the Ohio

Wrongful Death Statute; and Ohio Rev. Code § 2305.21.  Jurisdiction is premised on 28 U.S.C.

§§ 1331 and 1334 and on the Court's supplemental jurisdiction.

## II.  Allegations of the Complaint

Plaintiff Deborah Fink brings this action in her capacity as the duly-appointed

Administratrix of the Estate of her daughter, Angela Lawson, deceased.  Plaintiff makes the

following allegations in the complaint: Defendant City of Hamilton, Ohio, is a municipal

corporation and the employer of defendants Burkhardt, Heidorn, Sandlin and Walters, who at all

relevant times were acting under color of law in their capacity as police officers with the City of

Hamilton, Ohio.  On Sunday morning, January 8, 2006, at 1:43 a.m., Burkhardt and Heidorn

pulled over the vehicle driven by Lawson near the intersection of N.W. Washington Boulevard

and Thomas Boulevard in the City of Hamilton.  As she was being pulled over, Lawson panicked

and ingested a bottle of pills which she had in her possession.

Burkhardt noticed the smell of alcohol on Lawson and asked her to submit to a field

sobriety test, which she failed.  She told Burkhardt and Heidorn she had drunk a beer.  The

officers observed that Lawson's speech was slurred, her movements were slow, and she appeared

to be intoxicated.  Burkhardt then placed Lawson, who was 20 years-old, under arrest for driving

while she was impaired and for driving under a suspended license.  Heidorn searched Lawson's

vehicle and found a pill on the driver's seat.  Hamilton Police Dispatch checked with poison

control, which identified the pill as a schedule 4 controlled substance, Klonopin (clonazepam),

which is a highly potent anticonvulsant, amnestic, anxiolytic and muscle relaxant, similar to

Valium, in the class of drugs called benzodiazepines.  Symptoms of Klonopin overdose include

drowziness, dizziness, confusion, a slow heart beat, difficulty breathing, difficulty walking and

talking, the appearance of being drunk, and unconsciousness.

Heidorn arranged to have Lawson's vehicle towed while Burkhardt transported Lawson to Hamilton Police headquarters. Once there, Burkhardt tested Lawson on a BAC Datamaster and determined that her blood-alcohol content was 0.040g/210L. Lawson was charged with two misdemeanors: (1) operating a vehicle under age 21 with a blood alcohol content of 0.040 in violation of Ohio Rev. Code § 4511.19(B)(3), and (2) driving under suspension in violation of Ohio Rev. Code § 4510.11(A).

During the booking process, Lawson told Burkhardt she had taken pills. Lawson was given the opportunity to make a phone call, but she dialed the wrong number three times. Three officers, including Burkhardt, observed this. Lawson also disclosed her prior history of drug use and her past incarceration for that drug use. Burkhardt completed the City of Hamilton Police Department Medical Screening Form. Under the heading "Arresting Officer's Visual Opinion," Burkhardt stated that Lawson appeared to be under the influence of both alcohol and drugs.

Lawson's bond was set at $520 and she was confined in a holding cell at the Hamilton Police headquarters. At approximately 2:50 a.m. on January 8, Burkhardt and Sandlin placed her in the holding cell. As the Desk Officer, Sandlin was responsible for monitoring the condition of holding cell detainees. The holding cell in which Lawson was placed was equipped with a video monitor which allowed the Desk Officer and other officers to observe the condition and activities of the detainees.

Lawson initially sat in the cell crying with her face in her hands. She then lay down to sleep at approximately 3:30 a.m. At 4:15 a.m., she sat up but was unsteady. She then slumped forward in a seated position with her hands across her stomach and her head down at or below

her knees.  Between 4:15 and 5:00 a.m., she occasionally moved her head as if trying to sit up or breathe.  From 5:00 a.m. on, she remained motionless in that position with her head below her knees.  No police officer checked on Lawson's condition during this four-hour period.  No medical assessment or assistance was ever offered or provided to Lawson.

At 6:00 a.m. on January 8, defendant Walters relieved Sandlin as Desk Officer.  She never physically checked on Lawson's condition.   At approximately 9:00 a.m., Walters for the first time attempted to communicate with Lawson and discovered that she was nonresponsive. When she physically touched Lawson, she discovered that she was dead.  Her body was stiff, her neck was blue, and her face and lips were purple.  The Butler County Coroner determined that Lawson died of "multiple drug toxicity including Cocaine and Methadone.  The Cocaine metabolite Benzolecgonine was identified in the individual's blood."

Plaintiff alleges that as a proximate result of defendants' acts and omissions, Lawson was deprived of her right to necessary medical care while in pretrial detention in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I of the Ohio Constitution, she suffered loss of life, and she endured pain and suffering.  Plaintiff alleges that members of Lawson's estate suffered mental anguish, loss of income and services, and funeral and burial expenses.

### III.  Undisputed Facts

1.      In the early morning hours of Sunday, January 8, 2006, Angela Lawson was driving in
        Hamilton, Ohio, with her sister, Michelle "Ruby" Lawson.[1]  After having had a flat tire,
        they were driving on a spare tire that was not properly installed and that wobbled as they

---

[1]Angela Lawson is hereinafter referred to as "Lawson."

drove.

2.      Shortly after 1:30 a.m., Burkhardt pulled over the car to investigate a report he had

        received about Lawson from a citizen.  According to Burkhardt, he had pulled into a

        Speedway to get some coffee when a driver in the parking lot reported that a female had

        asked the driver and his friend to help her fix her front tire.  The driver told Burkhardt

        that the female appeared to be "under the influence" and had offered to get the driver

        some drugs.

3.      When Lawson rolled down her window, Burkhardt noticed that her eyes were slightly red

        and that she smelled faintly of alcohol.  Burkhardt asked her if she had been drinking

        alcohol.  She initially said that she had not, but she eventually admitted to drinking beer.

        Burkhardt asked Lawson to perform several field sobriety tests, and she cooperated.

4.      During Lawson's performance of the tests, Heidorn arrived on the scene to back up

        Burkhardt.  At the time of the incident, Heidorn had 15 years experience as a Hamilton

        police officer.

5.      In Burkhardt's estimation, the manner in which Lawson performed the tests indicated she

        was intoxicated.  Also, the officers noticed that her speech was slurred, her movements

        were slow, her eyes were a bit red, and she appeared intoxicated.  It appeared to Heidorn

        that Lawson moved and spoke somewhat slowly.

6.      Lawson admitted to both police officers that she had drunk a beer.

7.      Heidorn noticed a small white tablet on Lawson's car seat.  He removed the tablet and

        contacted Hamilton Police Dispatch and described the pill to Dispatch.  In turn, Dispatch

        contacted the Poison Control Center, which identified the tablet as a generic form of

Klonopin.

8.     Heidorn believed that Klonopin was a central nervous system depressant used to treat anxiety disorders.  It is in a class of drugs called benzodiazepines and is a Schedule IV controlled substance.  It is an anticonvulsant, anxiolytic, and a central nervous system depressant.  Symptoms of a Klonopin overdose include drowsiness (somnolence), confusion, coma and diminished reflexes.  Klonopin should not be taken with alcohol.

9.     Heidorn told Burkhardt he had found a Klonopin tablet in Lawson's vehicle.

10.     Burkhardt placed Lawson under arrest and transported her to the Hamilton Police Station. There she was searched and her personal property was inventoried.  No drugs of any kind were found in her possession.

11.     At the police station, Burkhardt tested Lawson on a BAC Datamaster and determined that her blood-alcohol content was 0.040g/210L.  Lawson was therefore charged with two misdemeanors: (1) operating a vehicle under age 21 with a blood-alcohol content of 0.040 in violation of Ohio Rev. Code § 4511.19(B)(3), and (2) driving under suspension in violation of Ohio Rev. Code § 4510.11(A).

12.     While in the Booking Room, Burkhardt heard Lawson tell another arrestee that "she had taken pills."  He recorded this in his Arrest Report.

13.     Heidorn noted that Lawson repeatedly asked him the same questions two or three times after he answered her questions the first time.  He drew the inference that Lawson was "intoxicated."

14.     Lawson did not ask Burkhardt, Heidorn, Sandlin or Walters for medical attention at any point in time.

15.     Burkhardt executed a Medical Screening Form for Lawson as part of the booking process. The purpose of the form is to "let the desk officer know if there's any potential problems with the inmate." On that form, Burkhardt stated that Lawson appeared to be under the influence of alcohol/drugs.

16.     Heidorn left the police station before Lawson was placed in the holding cell.

17.     After booking had been completed, Burkhardt turned Lawson over to Sandlin for incarceration. Burkhardt gave Sandlin the Arrest Report and the Medical Screening Form. Burkhardt left the police station shortly after he and Sandlin had placed Lawson in a holding cell, which is less than 50 feet from the Desk Officer's desk.

18.     Sandlin acknowledged receipt of the Arrest Report by signing it and he reviewed the Medical Screening Form. He knew based on the Report and Form that Lawson had been arrested for OVI, that her blood alcohol level was low, and that Burkhardt had listed her as being under the influence of alcohol/drugs.

19.     Sandlin had been hired as a civilian desk officer by the Hamilton Police Department in 2002. He had attended but did not complete the Police Academy. In 2005, he was designated as a corrections officer by the Hamilton Police Department.

20.     The holding cell in which Lawson was placed was equipped with a video monitor and intercom that allowed the Desk Officer and other officers to observe the condition and activities of the detainees and communicate with them.

21.     Sandlin was the Desk Officer on duty until his shift ended at 6:00 a.m. He performed periodic cell checks while Lawson was in the holding cell. He checked on Lawson at 2:55, 3:46, 4:12, 4:19, 4:40, 5:05 and 5:40 a.m. Each check consisted of him looking in

the window to the cell. He testified at his deposition that each time he looked in the cell, he saw Lawson breathing.

22. After she had been placed in the cell, Lawson initially sat crying with her face in her hands. Lawson lay down at approximately 3:30 a.m. At 4:15 a.m., she sat up. Between 4:15 a.m. and 5:00 a.m., Lawson occasionally moved her head.

23. Walters, who had learned to be a Desk Officer through on-the-job training in 2003 with Sandlin as her mentor, started her shift as Desk Officer at 6:00 a.m. Sandlin did not mention anything about Lawson to Walters. Upon assuming her duties, Walters did not review Lawson's Arrest Report or Medical Screening Form. The first time she reviewed the Arrest Report was at 7:30 a.m. as she was preparing paperwork for Lawson's transfer to the Butler County Jail. She read only the first page of the Arrest Report and thereby learned only that Lawson was charged with OVI. From this she assumed that Lawson was under the influence of alcohol.

24. Walters never reviewed the Medical Screening Form. She thus never knew that Burkhardt had determined that Lawson was under the influence of both alcohol and drugs.

25. Walters performed periodic cell checks during her shift. She checked on Lawson at 6:13, 7:03, 7:35, 8:24 and 8:51 a.m. Each check consisted of looking in the cell and seeing Lawson in the same position: sitting on a bench "half Indian style" with her right foot on the floor and her left foot on top of her right thigh. At no time during any of these visual checks did Walters attempt to determine whether Lawson was breathing. She never saw Lawson move.

26.     Walters understood that she was simply required to conduct a visual check on the prisoners by "looking at them through the window, and then stamping the time clock."

27.     At approximately 9:00 a.m., Lawson failed to respond to Walters' intercom call requesting that she get up for transport to the Butler County Jail. When Walters entered the cell to wake Lawson, she discovered that Lawson was dead. Walters testified at her deposition that Lawson felt stiff and her neck was blue.

28.     The Hamilton Police Department, in a Letter of Counseling issued to Walters, stated that "The investigation [of Angela Lawson's death] revealed that she probably died somewhere around 0500."

29.     The Butler County Coroner found that Lawson died of a drug overdose: "multiple drug toxicity including Cocaine and Methadone."

30.     Burkhardt testified at his deposition that he cannot remember receiving any training on the propriety of placing detainees under the influence of drugs or alcohol in a holding cell without first having that person examined by a medical professional.

31.     Heidorn testified that he was taught as a desk officer to three-hole punch the Medical Screening Form for prisoners in the holding cell and place it in a binder.

32.     A number of sections of the Hamilton Police Department procedures manual relate to the care of prisoners held in detention.

33.     Relevant portions of the Hamilton General Orders Procedures Manual in effect at the time of Angela Lawson's incarceration and death are §§ 4.3.17, 4.3.21, 4.4.5 and 4.5.5.

34.     The City of Hamilton's police officers were told that they had to "check on the prisoners" when they were the Desk Officer.

35.     Burkhardt testified that he would physically walk into the cell and make sure that the prisoner was responsive.

36.     Just over three years before Lawson's death, a juvenile named Johnny Dunn was arrested by Heidorn and taken to the Butler County Juvenile Detention Center.  While the parties dispute what happened, it is undisputed that Heidorn received a Letter of Counseling as a result of the incident.

37.     Sandlin had received no training on how to deal with someone who is under the influence of drugs as opposed to alcohol.  Nor did he have training in recognizing the symptoms of a drug overdose.  He could not recall whether he had received any training in determining whether a prisoner was a "high risk" prisoner because of alcohol or drug intoxication.

38.     City of Hamilton police officers were taught that a detainee may be taken to the hospital if they requested such treatment, were found to be unconscious, were having trouble breathing, or their blood alcohol level was in excess of .30.  Plaintiff alleges that these were the *only* circumstances under which officers were taught to transport a detainee to the hospital, which defendants dispute.

39.     The City of Hamilton police officers attended "in-service training," which included a section dealing with updates to the manual.  The parties disagree on the frequency and content of the training.

40.     Sandlin received no training on how to deal with someone under the influence of drugs or alcohol.  Nor did he have training in recognizing the symptoms of a drug overdose.  He could not recall receiving any training in how to determine whether a person was a "high risk" prisoner due to alcohol or drug intoxication.

# IV. Parties' Positions

## A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all claims against them. They argue that the Estate cannot meet the Fourteenth Amendment's deliberate indifference standard so that the individual defendants are entitled to qualified immunity on plaintiff's claims against them. In support of their position, defendants rely on the decisions in *Butler v. Coitsville Police Dept.*, 93 F.Supp.2d 862 (N.D. Ohio 2000), where the court purportedly held that knowledge of the arrestee's highly intoxicated condition, without more, was insufficient to charge the officials with knowledge of a substantial risk to his health or well-being, particularly since he did not complain of any physical distress during the arrest or booking process and he indicated he had no medical conditions other than bad knees; *Estate of Abdel-Hak v. City of Dearborn*, 872 F.2d 1023 (6th Cir. 1989), where the Sixth Circuit held that the officers were not deliberately indifferent to the decedent's medical needs based on their erroneous belief that the arrestee's behavior was the result of drunkenness, when in fact he was suffering from a cocaine overdose, and plaintiff introduced no evidence that failure to take drunken detainees to the hospital constitutes deliberate indifference to their medical needs; and *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003), where the officer delayed calling an ambulance for an arrestee who showed signs of a cocaine overdose because he initially believed the arrestee was feigning illness in order to attempt a second escape. Defendants also cite two unpublished district court decisions from the Eastern District of Kentucky. Defendants allege that all of these cases have a common theme in that the defendants underestimated the risk of danger the arrestees faced and in each, the

defendants' ability to accurately assess the risk was hindered to some extent by the fact that the arrestees did not disclose the nature and/or amount of the substance they ingested. Defendants contend that an official cannot be held liable for failing to fully appreciate a risk to an arrestee's health, which is all that occurred in this case.

Burkhardt specifically alleges that he cannot be deemed to have been deliberately indifferent to Lawson's medical needs because (1) the facts within his actual knowledge did not provide a sufficient basis from which to infer that she had a serious medical need, and (2) assuming, *arguendo*, that the facts were sufficient to allow such an inference, it is undisputed he did not draw the inference. He alleges that from his perspective, Lawson was moderately impaired from a low level of alcohol consumption combined with a dose of prescription medicine, Klonopin, which is insufficient as a matter of law to support a conclusion that he could have inferred, or actually did infer, that Lawson was actually at a substantial risk of overdosing on methadone and cocaine.

Heidorn similarly alleges that there is nothing in the facts from which he could have inferred that Lawson was at a substantial risk of overdosing on methadone and cocaine. He alleges that from his perspective, Lawson was awake and alert during the booking process and that he had no reason to believe anything other than that she was moderately impaired from a low level of alcohol consumption, possibly combined with ingestion of some amount of a prescription medication.

Sandlin claims that because he had received a copy of Lawson's arrest report, property inventory report, medical screening form and breathalyzer results, he knew Lawson had been arrested for driving while intoxicated, that a Klonopin tablet had been found in her vehicle, that

no other drugs had been found in her possession, and that her blood alcohol content level was .04%, which he considered to be a low level of intoxication. He also alleges that he knew she had fallen asleep, which was not unusual given the hour and which was typical of intoxicated arrestees. He alleges that he monitored Lawson and her fellow arrestees by checking the video monitor at his desk and by performing periodic cell checks where he walked into the hallway and looked into the cell. He claims that during the earlier cell checks, he noted that Lawson had moved or changed positions since his previous checks and that during later checks, he noticed that she had remained in the same position for a while so that he watched for the rise and fall of her chest or back and believed that she was breathing. Sandlin claims that there is nothing in these facts from which he could have inferred that Lawson was actually at a substantial risk of overdosing on methadone and cocaine.

Walters claims that she began her shift about an hour after the Estate's forensic pathologist purportedly opines that Lawson likely died. She claims that although she had available to her at the booking desk the same forms that Sandlin had reviewed, she did not review those forms immediately upon beginning her shift at 6:00 a.m. because she was helping to prepare some of the arrestees for transportation to the county jail. She claims that she performed cell checks beginning at 6:13 a.m. and that at each check, she believed Lawson was sleeping and did not appear to require any medical attention. Walters contends that if there was anything in these facts to demonstrate that she could have inferred that Lawson required medical attention, it is undisputed that she did not draw that inference. Walters further alleges that assuming, *arguendo*, she could have drawn such an inference immediately upon beginning her shift at 6:00 a.m., there is no action she could have taken to prevent Lawson's death, which

allegedly had occurred an hour earlier.

Each of the individual defendants claim that they are entitled to qualified immunity in their individual capacity based on the three-part test adopted by the Sixth Circuit in **Williams v. Mehra**, 186 F.3d 685, 691 (6th Cir. 1999).[2]  They claim that the evidence demonstrates they were not deliberately indifferent to Lawson's medical needs and the Estate has not adduced sufficient proof to permit a jury to conclude that they acted unreasonably with respect to Lawson's medical needs.  Rather, defendants allege that the evidence demonstrates that Burkhardt and Heidorn did not perceive Lawson to be highly intoxicated and they confirmed this through a breathalyzer test, Heidorn took steps to identify the pill found on the seat of Lawson's car, Burkhardt acted on that information by questioning Lawson on her consumption of the medication and her need for medical attention, Burkhardt concluded based on his observations of Lawson that she did not need medical attention, Sandlin and Walters believed that Lawson was moderately intoxicated and was "sleeping it off," and these officers checked on her periodically but did not perceive any signs of distress.

 The City of Hamilton claims that it is entitled to summary judgment on the Estate's Fourteenth Amendment claim because the Estate cannot establish that any of the officers violated Lawson's constitutional rights and, even if the Estate could establish a violation, it cannot show that the violation resulted from an unconstitutional policy or custom of the City. The City contends that it cannot be held liable under a failure to train theory because the Estate has not demonstrated any deficiency in the training the City provided its officers with regard to

---

[2]Plaintiff correctly notes that the three-part test has been discredited and that the Sixth Circuit has resumed applying the two-part test set forth by the Supreme Court in **Saucier v. Katz**, 533 U.S. 194 (2001), as modified by **Pearson v. Callahan**, __ U.S. __, 129 S.Ct. 808 (2009).

recognizing when a detainee is experiencing a "serious medical need" and in responding appropriately.

All defendants argue that they are entitled to summary judgment on the Estates's state law claims because Article I, § 1 of the Ohio Constitution does not provide a private cause of action for damages as it is not self-executing and there is no enabling legislation; Article 1, § 9 does not provide a private cause of action and its prohibition against cruel and unusual punishment does not apply to a pretrial detainee; and Article I, §§ 10 and 14 do not apply in the context of this case and do not support the Estate's claim against the defendants.

## B. Plaintiff's Response and Motion for Summary Judgment

Plaintiff largely agrees with the facts as stated by defendants but disagrees with certain allegations as set forth below:

- While defendants state that Lawson's eyes "twitched" during her sobriety field test "indicating that she was under the influence of alcohol," which presumably refers to the condition known as "nystagmus," defendants fail to state that drug use, including Klonopin use, also causes nystagmus.

- Defendants erroneously state that the Ohio blood alcohol level for minors under age 21 is 0.002, when in fact it is 0.020.

- Defendants inaccurately state that plaintiff's forensic pathologist, Dr. Gary Lee Utz, opined that Lawson died at 5:00 a.m., when in fact he stated that she died some time between 5:00 a.m., when she was last seen to move, and shortly before she was found dead at 9:09 a.m., and the fact that her body had apparently cooled to 92 degrees Fahrenheit by 12:20 and that at least some rigor mortis and some livor mortis were

present suggested that the time of death was closer to 5:00 a.m. than 9:09 a.m.

- It was the Hamilton Police Department that assumed Lawson died at 5:00 a.m. based on the fact that Lawson stopped moving at that time.

- According to plaintiff, the video of Lawson in her cell, which plaintiff has submitted as part of the record, suggests that the more likely time of death is around 6:15 to 6:30 a.m. as evidenced by what plaintiff alleges to be urine traveling from her right leg across the cell floor to the center drain at that time.

- According to plaintiff, Lawson disclosed to Burkhardt and the other officers in the booking room that she had taken an unspecified quantity of "pills" and she had previously been convicted of drug abuse.

- According to plaintiff, before Lawson's death, Burkhardt placed in the Arrest Report that Lawson "stated that she had taken pills," while after her death, Burkhardt states that Lawson told him the pills were Klonopin and the medication had been prescribed for her. In addition, plaintiff alleges that "[i]t is a common knowledge/almanac-type fact worthy of judicial notice that alcohol and prescription drugs pose a serious threat to one's health." In support of this allegation, plaintiff relies on (1) a National Institute of Health ("NIH") Alcohol Alert issued 11 months prior to Lawson's death which stated that "Many medications can interact with alcohol, leading to increased risk of illness, injury or death;" and (2) an NIH publication issued three years before Lawson's death entitled "Harmful Interactions: Mixing Alcohol with Medicines," which warned that "Mixing alcohol and a medication puts you at risk for dangerous reactions," and that mixing alcohol with certain medications could cause reactions and risks such as drowsiness, loss

of coordination, heart problems and difficulty breathing." The publication advised readers to talk to a pharmacist or health care provider to learn whether a medicine will interact with alcohol. The publication listed among the possible reactions of taking Klonopin with alcohol drowsiness, dizziness, and increased risk for overdose. Doc. 40, Exh. Z. Based on these sources, plaintiff asks the Court to take judicial notice of the "fact" that a person who has consumed both alcohol and drugs has a serious medical need because such "fact" is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *See* Fed. R. Ev 201.

Plaintiff alleges based on the undisputed facts that the Fourteenth Amendment deliberate indifference standard is satisfied because the circumstances clearly establish the existence of a sufficiently serious medical need - i.e., Lawson had ingested drugs and alcohol and showed all the symptoms of a drug overdose - which even a layperson would easily recognize, so that the need was obvious. Plaintiff generally alleges that the defendant officers were aware of the following facts:

• Lawson had consumed both alcohol and drugs.

• Lawson was experiencing motor difficulties in that she failed the field sobriety test and she had slurred speech, slow movements, and nystagmus.

• Lawson had cognitive difficulties in that she had problems dialing a phone and she repeatedly asked the same questions.

• Lawson remained in an awkward position with her head below her knees for over four hours without moving

In addition to these facts, plaintiff claims that there was a path of urine leading from Lawson's body to the drain in the center of the cell, which occurred sometime around 6:00 a.m. Plaintiff further alleges that Heidorn knew that persons under the influence of drugs are at a

serious medical risk as evidenced by his experience in 2002 with Johnny Dunn, a juvenile under the influence of drugs who stopped breathing.

Plaintiff specifically alleges that Burkhardt and Heidorn were aware of the following facts which show that Lawson had a serious medical need for care:

•   A layperson at the Speedway parking lot told Burkhardt that Lawson had drugs and appeared to be "under the influence of something."

•   Both officers detected the smell of alcohol on Lawson.

•   Both officers knew that Lawson had failed the field sobriety test and therefore demonstrated a lack of motor coordination.

•   Burkhardt observed that Lawson had trouble dialing the phone to make a call.

•   Heidorn observed that Lawson repeatedly asked him the same questions after he had provided her with answers the first time.

•   Both officers heard Lawson admit she had drunk a beer.

•   Both officers observed that Lawson's speech was slurred, her movements were slow, and her eyes were a bit red.

•   Both officers knew of the Schedule IV Klonopin tablet on Lawson's car seat.  Heidorn knew that Klonopin is a central nervous system depressant.

•   Both officers were in the booking room when Lawson told the Hamilton Police Sergeant about her past drug use and resulting conviction for drug abuse.

•   Burkhardt administered the blood-alcohol test to Lawson and knew that her blood-alcohol content violated Ohio law at 0.040g/210L.

•   Burkhardt heard Lawson admit that she had taken "pills."

•   Heidorn knew that a person under the influence of drugs was in serious need of medical care and may stop breathing at any time, requiring life support, based upon his 2002 experience with Johnny Dunn and a resulting Letter of Counseling he received from his Police Department superiors.

Plaintiff contends that Burkhardt and Heidorn were deliberately indifferent to Lawson's

serious need for medical care because although they drew the inference from the above facts that she was "intoxicated," they never attempted to provide her with a medical assessment or care.

Plaintiff contends that Sandlin and Walters were deliberately indifferent to Lawson's serious need for medical care because they had been provided with paperwork which demonstrated:

- Lawson had failed the field sobriety test.

- She had the smell of alcohol on her person.

- A Klonopin pill was found on the driver's seat of the car she had been driving.

- She had admitted taking an unspecified number of "pills."

- Her blood alcohol test results.

- She had experienced repeated trouble dialing the phone at the police station.

- Someone had reported to Burkhardt at Speedway that Lawson appeared to be under the influence of something.

- The Medical Screening Form stated that Lawson was under the influence of both alcohol and drugs.

In addition, plaintiff states that both officers repeatedly saw Lawson sitting motionless in a contorted and awkward position, with her arms folded across her stomach, her left foot on top of and across her right knee, her body folded over at the waist, her head below her knees, for four hours without moving, yet they did nothing.    Plaintiff alleges that Sandlin demonstrated deliberately indifference to the fact that Lawson remained motionless in an awkward position for the last 11/2 hours of his shift by failing to check to see if she was conscious.  Plaintiff alleges that Walters was deliberately indifferent by (1) failing to review the Medical Screening Form reporting that Lawson was under the influence of alcohol and drugs, and (2) never attempting to

determine during her checks whether Lawson was conscious or breathing.

Plaintiff contends that the cases defendants cite in support of their summary judgment motion are distinguishable from the present case because in each of those cases, the detainee either refused medical care or hid a serious medical condition, whereas in this case it is undisputed that Lawson disclosed her consumption of alcohol and drugs and the police drew the inference she was under the influence of both alcohol and drugs. Plaintiff contends that Lawson exhibited overdose symptoms of cognitive and motor difficulties as well as drowsiness.

Plaintiff further argues that the officers are not entitled to qualified immunity under the applicable two-part analysis of *Saucier*, 533 U.S. at 201. Plaintiff argues that construing the facts in the Estate's favor, "even a layperson would easily recognize the necessity for a doctor's attention" under the circumstances presented. *See Blackmore v. Kalamazoo Cty*., 390 F.3d 890 (6th Cir. 2004).

Finally, plaintiff argues that the City of Hamilton is liable because its alleged failure to train its officers "evidences a 'deliberate indifference' to the rights of its inhabitants," and specifically to serious medical needs. *See City of Canton v. Harris*, 489 U.S. 378 (1989). Plaintiff claims that liability can arise and deliberate indifference can be established by proof that the City knows that inmates face a substantial risk of serious harm and it disregards the risk by failing to take reasonable measures to abate the risk. Plaintiff claims that despite being on notice that detainees may be under the influence of drugs and/or alcohol, and despite the Police Department having actual notice of a serious medical need arising when a detainee is under the influence of drugs as a result of the Johnny Dunn incident, the City of Hamilton deliberately refused to train its officers in how to recognize and deal with such life-threatening situations.

Plaintiff claims that such failure was compounded by the lack of medical personnel in the police station to assess the condition of detainees under the influence of drugs. Plaintiff alleges that the City's deliberate indifference to known serious medical needs resulted in inadequacies in the City's training program and that "these training inadequacies closely related to" Lawson's injury.

Plaintiff alleges that there is evidence throughout the record of particular deficiencies in the City's training of its police officers for their task of caring for the serious medical needs of detainees. Plaintiff makes the following specific allegations: First, aside from a day of training during an officer's initial orientation, there was virtually no training in the Hamilton Police Department General Orders Procedure Manual that covered the care of a detainee under the influence of alcohol and/or drugs. Second, training for the Desk Officer position was on-the-job. Third, the Police Department provided no specific training on how to implement § 4.3.17 of the Procedure Manual, "Incarceration," and § 4.5.5, "Special Jail Facilities." Fourth, there was no uniform formal training as to what a Desk Officer was required to do to comply with the Procedures Manual requirements in §§ 4.3.17.2.1.1 and 4.5.5.1.1, which provide that persons under the influence of drugs or alcohol be kept under "close observation." Fifth, there was no uniform formal training as to how a police officer was to determine whether a prisoner was at special risk because of intoxication as discussed in § 4.4.5 of the Procedure Manual, entitled "Duties of the Desk Officer." Sixth, while § 4.3.17.2.1.1, entitled "Incarceration," required that "Persons having physical reactions caused by alcohol, drugs, or other conditions should be detained in other facilities," the Police Department never trained its officers on how to determine whether a detainee is having a physical reaction to drugs. Seventh, although § 4.3.21, entitled

"Ill or Injured Prisoners," provides that all prisoners exhibiting an illness must first be taken to the hospital for examination and/or treatment, the officers received no training in how to determine whether a prisoner was exhibiting an illness like drug abuse or alcoholism. Eight, the officers received no training on whether or when it is proper to place a prisoner who is under the influence of alcohol or drugs in a holding cell without first having that person examined by a medical professional, but instead the officers were taught that a detainee may be taken to the hospital only if they request such treatment, are found to be unconscious, are having trouble breathing, or their blood-alcohol level is in excess of 0.30. Ninth, there was no training concerning § 4.4.5's requirement that intoxicated prisoners be checked every 10 minutes as opposed to the 15, 20 or 30 minute intervals listed elsewhere in the Manual, and plaintiff notes that Walters let 50 minutes elapse between her 6:13 a.m. check and 7:03 check in violation of all procedures set forth in the Manual. Tenth, officers received no training on how to perform checks, which consequently devolved into cursory looks into the cell windows followed by the punching of a time card. Finally, plaintiff asserts that the City provided no training to the officers on what to do with the information contained in the Arrest Reports and Medical Screening Forms.

Plaintiff states that it agrees to dismissal of the counts of the Complaint brought under Ohio law and chooses to proceed with only the federal claims brought under 42 U.S.C. § 1983.

## C. Defendants' Response

In reply, defendants challenge plaintiff's assertion that drug use causes nystagmus, claiming that plaintiff's only support for this proposition is a pamphlet that lists nystagmus as an adverse reaction to Klonopin that could be experienced by a person who has a seizure disorder

(or who suffers from panic attacks).  ***See*** Doc. 40, Exh. D.  Defendants also challenge plaintiff's assertion as irrelevant because the focus must be on facts that Burkhardt knew, there is no evidence he knew Klonopin causes nystagmus, and even if he knew of that possibility, the evidence demonstrates that he perceived Lawson's nystagmus to be caused by alcohol intoxication.  Defendant asserts that it is undisputed that Lawson was not actually under the influence of Klonopin as there were no benzodiazepines in her system at the time of her death.

Defendants further allege that the Estates's assertion that Lawson died between approximately 6:15 a.m. and 6:30 a.m. is pure speculation.  Defendant also argues that the Estate's assumption that the evacuation of bodily fluid occurs immediately upon death is not supported by the record.

In addition, defendants deny that Lawson disclosed to them that she had taken an unspecified quantity of pills or that she had previously been convicted of drug abuse. Defendants assert that Lawson referred to "pills" when talking with another detainee in the booking room, and when Burkhardt overheard her statement and questioned her about this, she told him she had taken Klonopin consistent with a doctor's prescription.  Burkhardt argues that based on that information, he had no reason to suspect that Lawson had taken any drug other than Klonopin or that she had taken it in an unsafe quantity.  Defendants also deny that they overheard a statement Lawson made by the fingerprinting officer, a non-defendant, to a non-defendant officer to the effect that she had previously been incarcerated for drug use.

Defendants further argue that it would be inappropriate for the Court to take judicial notice of the alleged "fact" that a person who has consumed both alcohol and drugs has a serious medical need because the supporting pamphlets plaintiff has offered in support of this premise

do not indisputably establish it.  Defendants contend that in any event, the evidence offered is irrelevant because it establishes only that a person who consumes alcohol and drugs might, depending on what he has consumed, experience side effects that may or may not require medical attention.

Defendants further contend that Lawson hid a serious medical condition, which was her consumption of a lethal amount of methadone, cocaine and/or opiates.

In addition, defendants argue that plaintiff attempts to lower the deliberate indifference standard for Burkhardt and Heidorn by simply arguing that they drew the inference that Lawson was under the influence of both alcohol and drugs, which would not necessarily place her at a substantial risk of serious harm.  Defendants Sandlin and Walters reiterate these arguments on their behalf and contend that there is no evidence they perceived Lawson's position as "contorted" or "awkward" or that they perceived her to be motionless for a period of four hours from 5:00 a.m. to 9:00 a.m.  In addition, Sandlin contends that Lawson had moved or changed her position between his first check at 2:55 a.m. and his 4:40 a.m. check and that although her position had not changed between 5:05 a.m. and 5:40 a.m., he observed movements that suggested to him she was breathing.  He claims that he cannot be held liable under a deliberate indifference standard based simply on the fact that Lawson was intoxicated and given his belief that she was sleeping.  Walters alleges that her failure to review Lawson's forms does not demonstrate deliberate indifference because she could not have inferred that Lawson was at a substantial risk of serious harm from the information contained in the forms.  In addition, Walters contends that she checked on Lawson five times and neither the other officers in the holding cell area nor Walters' own cellmates noticed anything unusual about her.

The defendant officers allege that Lawson presented as an individual who had consumed a relatively small amount of alcohol and had taken a routine prescription dose of Klonopin; although her speech was slurred and somewhat slow, she was otherwise able to participate in the booking process; she was coherent, conversant, and able to provide basic personal information to the booking officers; she walked without difficulty; she did not appear to be in physical distress; and when placed in the holding cell, she fell asleep, which was not unusual given that it was 3:00 a.m. and she was intoxicated. Defendants claim that under these circumstances, they could have reasonably believed that they were not required to provide medical attention to Lawson.

Turning to the City's liability, the City argues that its General Orders make clear that the holding cell is not equipped to provide "treatment" to arrestees who are so intoxicated as to require it, and the General Orders provide officers direction in determining when an arrestee is so intoxicated as to require treatment. *See* Pltf's MSJ, Exh. N. The City points to provisions of the General Orders that specify an arrestee must be taken to the hospital if his blood-alcohol content is .30 or higher; regardless of whether the arrestee's blood-alcohol content is .30 of higher, the arrestee should be transported to another facility if at the time of arrest, the arrestee appears to be having physical reactions caused by alcohol or drugs; and in the event another facility is not available under such circumstances, the officer may transport the arrestee to the City's holding facility but is expected to perform documented surveillance of the arrestee every 15 to 20 minutes. The City notes that if none of the above apply, the General Orders provide that a Desk Officer is supposed to check on arrestees in the holding cell at fluctuating intervals of no greater than 10 minutes for special risk detainees and no greater than 30 minutes for detainees with no special risks; officers are expected to call 911 and provide first aid for an

arrestee who becomes ill during the booking process or after being placed in the booking cell when the illness appears to be an emergency; and officers must transport arrestees who become ill to the hospital or release them on an "own recognizance" bond depending on the nature of the charge against them.  The City notes that the General Orders define an "emergency" as including unconsciousness, inability to breath or severe difficulty in breathing, complaints of injury or requests for medical care, and any illness which is unrecognizable to police personnel.

The City claims that it is undisputed that its officers are provided a copy of these policies and procedures and are trained on them when they begin their employment and twice per year thereafter.  *See* Sandlin depo., p. 15.  The City contends that officers also receive training in how to detect the influence of alcohol and/or drugs.  *See* Burkhardt depo., p. 89.  The City argues that the term "visually check" is self-explanatory and a failure to provide more in-depth training on this particular requirement cannot form the basis for a failure to train claim.

## V.  Applicable law

### A.  Qualified immunity

Government officials performing discretionary functions are generally immune from liability for civil damages so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  ***Harlow v. Fitzgerald,*** 457 U.S. 800, 818 (1982).  Whether a defendant is entitled to qualified immunity is a question to be resolved at the earliest possible stage of the litigation.  ***Saucier,*** 533 U.S. at 201.  Resolving the issue requires a two-part inquiry: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (2)  If a violation could be made out on a favorable view of the parties' submissions, was the right

clearly established? *Id*. at 201.

**B. Title 42 U.S.C. § 1983**

To establish a claim under 42 U.S.C. § 1983, the plaintiff must prove that "(1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." ***Berger v. City of Mayfield Heights,*** 265 F.3d 399, 405 (6th Cir. 2001). Individuals have a federal right under the Eighth Amendment to be free from the infliction of cruel and unusual punishments. Pretrial detainees enjoy protection under the Fourteenth Amendment's Due Process Clause that is analogous to that afforded inmates under the Eighth Amendment. ***Bell v. Wolfish***, 441 U.S. 520 (1979).

The Constitution prohibits the "unnecessary and wanton infliction of pain" arising from a state actor's "deliberate indifference" toward an inmate's serious medical needs. ***Estelle v. Gamble,*** 429 U.S. 97, 104 (1976). To establish a claim under the Fourteenth Amendment for deliberate indifference to serious medical needs, a plaintiff must show that (1) the deprivation alleged is objectively "sufficiently serious" and (2) the prison official had a sufficiently culpable state of mind. ***Farmer v. Brennan,*** 511 U.S. 825, 834 (1994). A medical need is objectively serious if even a lay person would recognize the seriousness of the need for medical care. ***Johnson v. Karnes,*** 398 F.3d 868, 874 (6th Cir. 2005) (citing ***Blackmore v. Kalamazoo County***, 390 F.3d 890, 899 (6th Cir. 2004)).

To satisfy the state-of-mind component, the plaintiff must show deliberate indifference towards the inmate's health or safety. ***Farmer,*** 511 U.S. at 834. Deliberate indifference "entails something more than mere negligence." *Id.* at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." *Id.* at 837. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." ***Horn by Parks v. Madison County Fiscal Court***, 22 F.3d 653, 660 (6th Cir. 1994). That the official actually drew the required inference may be demonstrated through circumstantial evidence or by showing that the risk was "obvious." ***Estate of Owensby v. City of Cincinnati.*** 385 F.Supp.2d 626, 648 (S.D. Ohio 2004), ***aff'd***, 414 F.3d 596 (6th Cir. 2005) (citing ***Farmer***, 511 U.S. at 842).

Failure to follow internal procedures regarding the treatment of detainees is not enough, standing alone, to deprive officials of qualified immunity under the Fourteenth Amendment. ***See Bradley v. City of Ferndale***, 148 Fed. App'x 499, 507 (6th Cir. 2005).

## C. Municipal Liability

A two-pronged inquiry applies to claims brought against a municipality under § 1983: (1) has the plaintiff shown the deprivation of a constitutional right, and (2) is the municipality responsible for the violation? ***Doe v. Claiborne Cty***., 103 F.3d 495, 505-06 (6th Cir. 1996). To satisfy the second prong of the inquiry, the plaintiff must prove that the municipality's policy or custom caused the alleged injury. ***Ellis v. Cleveland Mun. Sch. Dist***., 455 F.3d 690, 700 (6th Cir. 2006) (citing ***Monell v. Dep't of Soc. Servs***., 436 U.S. 658, 690-91 (1978)). A systematic failure to train police officers adequately is a policy or custom which can lead to liability of a city. ***Gregory v. City of Louisville***, 444 F.3d 725, 753 (6th Cir. 2006) (citing ***City of Canton***, 489 U.S. at 388). "Only when the failure to train amounts to 'deliberate indifference' on behalf of the city entity toward its inhabitants . . . will failure to train lead to city liability under § 1983." ***Id***. The Supreme Court in ***City of Canton*** recognized at least two situations in which inadequate training

could be found to be the result of deliberate indifference: (1) "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction," and (2) fail[ure] to act in response to repeated complaints of constitutional violations by [the city's] officers." *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003) (citing *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

To be actionable, a municipality's training must be inadequate to the tasks that its officers must perform; this inadequacy must be the product of deliberate indifference; and this inadequacy must have been closely related to or have actually caused the plaintiff's injury. *Id*. (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

The Supreme Court explained the theory of municipal liability premised on inadequate training in *City of Canton*, 489 U.S. at 390, as follows:

> The issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

## VI.  Analysis

### A.  Claims against Defendants Burkhardt and Heidorn

The Court finds that defendants Burkhardt and Heidorn are entitled to qualified immunity on plaintiff's Fourteenth Amendment claims against them because the undisputed facts, taken in the light most favorable to the Estate, do not show that these officers' conduct violated Lawson's

Fourteenth Amendment rights.  Initially, the Court rejects plaintiff's attempts to equate the mere state of being under the influence of alcohol and drugs with a serious medical need and to eliminate the necessity of examining the circumstances of this particular case to determine whether a serious medical need existed.  The evidence submitted by plaintiff does not support the broad, generalized conclusion that any individual under the influence of alcohol and drugs has a serious medical need, and the Court therefore cannot take judicial notice of this alleged "fact" pursuant to Fed. R. Ev. 201.  Instead, it is necessary to look at the circumstances surrounding a particular detainee to determine if their ingestion of alcohol and drugs created a serious medical need and to ascertain whether that medical need was objectively sufficiently serious.

The facts clearly demonstrate that plaintiff had a serious medical need that manifested itself at some point during her pretrial detention.  The undisputed facts do not permit a finding, however, that the need was *objectively* serious when Burkhardt and Heidorn were interacting with Lawson, i.e., during her arrest and booking.  The facts disclose that Lawson appeared to be intoxicated and under the influence of both alcohol and drugs at the time of her arrest and booking, but the evidence concerning Lawson's appearance, behavior, and cognitive impairments, which included trouble dialing the phone and asking Heidorn to repeat his questions, do not suggest that a lay person, or even a layperson trained to recognize the signs of a drug overdose, would recognize the seriousness of her condition and her need for medical care.  To the contrary, Lawson's physical symptoms and behavior suggested only that she was moderately intoxicated.  Plaintiff has not offered any evidence to suggest that Lawson was exhibiting the signs of a drug overdose during her interactions with Burkhardt and Heidorn.

Nor do the facts when construed in plaintiff's favor permit a finding that either Burkhardt or

30

Heidorn were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed or that they drew such an inference. At most, Burkhardt and Heidorn knew that Lawson was under the influence of alcohol and drugs, but that knowledge, coupled with her behavior, did not clearly indicate the need for medical care for a drug overdose. There was nothing about Lawson's circumstances that would have alerted Burkhardt and Heidorn to the fact that her needs differed from those of a detainee who is under the influence of alcohol and drugs but is still fairly coherent and does not require medical attention. The Constitution does not require an officer to provide medical assessment and care to every intoxicated person he arrests, regardless of the degree of impairment.

For these reasons, a finding of deliberate indifference on the part of Burkhardt and Heidorn cannot be made based on the facts of this case. These defendants are therefore entitled to qualified immunity on the claims against them in their individual capacity. Because plaintiff cannot establish that defendants Burkhardt and Heidorn violated Lawson's constitutional rights, these defendants are likewise entitled to summary judgment on the claims brought against them in their official capacity.

## B. Claim Against Sandlin

The Court has viewed the pertinent portions of the videotape of Lawson in the cell. Based on the videotape, the Court finds that Sandlin is not entitled to qualified immunity because there are genuine issues of material fact as to whether he was deliberately indifferent to Lawson's serious medical need. While it is true that there is nothing in the facts from which Sandlin could have inferred that Lawson was actually at a substantial risk of overdosing specifically on methadone and cocaine, plaintiff's burden is not so high that it must show that Sandlin knew precisely the substances that created an objectively serious medical need. It is only necessary that the adverse

reaction manifested itself in a way that would be obvious to even a lay person and that Sandlin actually drew the inference that a substantial risk of serious harm existed. A reasonable jury could find that both prongs are satisfied in this case. Sandlin was aware that Lawson was under the influence of alcohol and/or drugs; that she remained in what a reasonable individual could describe as a contorted and bizarre position that a person would not normally fall asleep in or remain asleep in for an extended period of time; and that she did not change her position for a substantial period of time. While Sandlin testified that he deduced from his observations of Lawson's chest and back during his later checks that she was breathing, Sandlin cannot escape liability at the summary judgment stage on this ground. Rather, a reasonable juror could discredit his testimony based on their viewing of the videotape. Moreover, a reasonable jury could conclude that Sandlin ignored other signs that Lawson was at a substantial risk of serious harm, even if she was still breathing, and declined to confirm that she was at risk. *See Bertl v. City of Westland,* 2009 WL 247907 *7 (6th Cir. 2009) (unpublished decision) (Sixth Circuit has denied summary judgment on qualified immunity grounds to prison officials based on their avoidance of knowledge).

Accordingly, because there are issues of fact as to whether Sandlin violated Lawson's constitutional rights, which were clearly established at the time of her death, Sandlin is not entitled to qualified immunity. The Court will therefore deny his motion for summary judgment. As there are issues of fact that must be determined before plaintiff's claim against Sandlin can be resolved, plaintiff is likewise not entitled to summary judgment on its claim against Sandlin.

## C. Claim Against Walters

The Court finds that Walters likewise is not entitled to qualified immunity on the Fourteenth Amendment claim against her. Walters was unaware that Lawson was intoxicated at the start of her

shift because she had not reviewed Lawson's paperwork.  This does not absolve Walters from

liability, however, because like Sandlin, she observed Lawson in a contorted position that Lawson

remained in for several hours.  Whether Walters inferred from Lawson's strange position and her

failure to move, together with the remaining circumstances, that Lawson was in distress and

required medical care is a determination for the jury to make under the facts of this case.[3]

Accordingly, Walters is not entitled to qualified immunity and her motion for summary judgment

must be denied.  As there are issues of fact that must be determined before plaintiff's claim against

Walters can be resolved, plaintiff is likewise not entitled to summary judgment on its claim against

Walters.

## D.  Claim Against the City

Plaintiff claims that the City was deliberately indifferent based on its failure to adequately

train its officers to deal with a serious medical need such as Lawson's because it had no medical

personnel available to assess whether Lawson was suffering from a drug overdose and it never

trained its officers to deal with that need.  Plaintiff claims that each officer testified that they

received no training on the critical sections of the General Procedures Manual that dealt with

detainees or in recognizing the symptoms of a person under the influence of drugs or suffering from

a drug overdose.  Plaintiff claims that Walters was never trained to review Arrest Reports or

Medical Screening Reports for detainees, and she never received any training from the Police

Department to check on detainees to insure they were alive and well, although she was instructed to

enter the cell physically to check on a detainee's condition if it appeared there was something

---

[3]It is not clear from the evidence whether Lawson was alive when Walters began her shift.  This is a determination that requires the resolution of disputed factual evidence and which therefore cannot be made on summary judgment.

wrong with the detainee. Plaintiff has offered the expert report of Michael D. Lyman, Ph.D., on the issue of whether the City's failure to train Desk Officers on how to handle the information contained in the Arrest Reports and Medical Screening Forms violates the standards of the Commission on Accreditation for Law Enforcement Agencies and renders the Screening Form useless as a tool to determine whether medical attention is required." *See* Doc. 31, Exh. G.

Having reviewed the evidence of record, including the defendant officers' deposition testimony concerning the training they received, as well as the pertinent provisions of the City's policies and procedures, the Court finds that a reasonable jury could conclude that the City failed "to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." ***See Cherrington***, 344 F.3d at 646 (citing ***Brown***, 172 F.3d at 931). Thus, in the event either Sandlin or Walters is found liable for a violation of Lawson's Fourteenth Amendment rights, there is an issue as to whether the City of Hamilton can be held liable under a failure to train theory. Accordingly, neither the City of Hamilton nor plaintiff is entitled to summary judgment on plaintiff's claim against the City.

## VII.  Conclusion

In accordance with the foregoing, plaintiff's motion for summary judgment (doc. 40) is hereby **DENIED.**  Defendants' motion for summary judgment (doc. 30) is hereby **DENIED** in part and **GRANTED** in part.  The motion is **DENIED** with respect to plaintiff's claims against defendants Sandlin, Walters, and the City of Hamilton.  The motion is **GRANTED** with respect to plaintiff's claims against defendants Burkhardt and Heidorn.  Defendants Burkhardt and Heidorn are **DISMISSED** as parties to the lawsuit.  The case will proceed to trial on the claims against the remaining defendants in accordance with the schedule established by the Court.

**IT IS SO ORDERED**.


S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
 UNITED STATES DISTRICT COURT